*14 OPINION.
Seaweed:
Issue 1 (a). — We will first direct our attention to the statutory basis for the exhaustion and obsolescence deductions claimed by petitioner. The proof offered by both parties was on the ground that the basic date of valuation was February 19, 1924, the date petitioner acquired the properties in question from the Hazeltine Research Corporation and Taylor in exchange for 155,250 and 14,750 shares, respectively, of petitioner’s capital stock. Petitioner in its brief argues, as a question of law, that the base for measuring ex *15 haustion and obsolescence of the “ patent situation ” is not the base of the predecessors, but the cost of the properties to petitioner. The respondent, in his brief,, and again in his reply brief, on the question of law thus referred to, simply remarks that while he has not seen fit to argue the case on the basis of the deficiency notice, “ it is not to be presumed therefrom that the issue is waived.” In the statement attached to the deficiency notice in Docket No. 42277 the respondent said:
Tour contention that the depreciation deductions claimed on patents be allowed has been denied.
***#❖♦*
Section 204 (a) (8) of the Revenue Acts of 1924 and 1926 provides that if the property was acquired by a corporation by the issuance of this [sic] capital stock then the basis shall be the same as it would be in the hands of the transferor.
It is noted that the patents acquired for stock were valued on the books in the amount of $3,607,500.00 and depreciation computed on that basis. No evidence has been submitted to disclose the value of the patents in the hands of the trans-feror. In the absence of evidence to establish the basis on which the depreciation allowance may properly be computed under the regulations referred to herein, no allowance may be made.
Substantially similar statements were made in all of the later notices.
The applicable statutes are the Revenue Acts of 1924, 1926, and 1928. Section 204 (c) of the Revenue Acts of 1924 and 1926 and section 114 (a) of the 1928 Act provide that the “ basis ” upon which exhaustion and obsolescence are to be allowed in respect of any property shall be the same as is provided “ for the purpose of determining the gain or loss ” upon the sale or other disposition of such property. Section 204 (a) of the 1924 and 1926 Acts and section 118 (a) of the 1928 Act provide in part as follows:
The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—
The only exceptions necessary to consider are paragraphs (7) and (8) of those sections, which are as follows [The following quotations are from the 1924 and 1926 Acts; paragraphs (7) and (8) of section 113 (a) of the 1928 Act are substantially the same] :
(7) If the property (other than stock or securities in a corporation a party to the reorganization) was acquired after December 31, 1917, by a corporation in eonneetion loith a reorganization, and, immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made;
(8) If the property (other than stock or securities in a corporation a party to a reorganization) was acquired after December 31, 1920, by a cor *16 poration by the issuance of its stock or securities in connection with a transaction described, in paragraph H) of subdivision (0) of section 203 (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money in addition to such stock or securities), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. [Italics supplied.]
Section 203 (b) (4) of the 1924 and 1926 Acts, referred to in paragraph (8), supra, and section 112 (b) (5) of the 1928 Act are identical and provide that:
No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. [Italics supplied.]
The term “ control ” is defined identically the same in all three acts, in section 203 (i) of the 1924 and 1926 Acts and section 112 (j) of the 1928 Act, as follows:
As used in this section the term “ control ” means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.
Did an interest or control in the assets transferred or ownership of 80 percent or more of petitioner’s stock remain in or vest in the transferors, the Hazeltine Research Corporation and Willis H. Taylor, Jr.? These transferors transferred property to the petitioner in exchange for 170,000 shares or more than 96 percent of its total issue of 175,000 shares. But more than two weeks before the exchange, namely, on February 2, 1924, one of the transferors, the Hazeltine Research Corporation, had agreed to sell 135,000 of such shares to Foster, McConnell & Co. for $650,000 in cash. In the contract providing for the organization of petitioner it was not intended that the old corporation should remain in control of the new corporation or retain ownership of more than approximately 12 percent of its capital stock. The contract further provided that of the remaining 12 percent or 20,250 shares, Foster, McConnell & Co. was to have an option for a period of one year to purchase 10,000 of such shares at a price of $15 per share. In issuing the 155,250 shares to the Hazel-tine Research Corporation, petitioner executed two stock certificates, numbered T 1 and T 3. T 1 was for 135,000 shares and T 3 was for 20,250 shares. T 1 was immediately assigned by the Hazeltine Research Corporation to Foster, McConnell & Co. in exchange for $650,000 in cash. A substantial majority of the original board of *17 directors of petitioner had been nominated and elected by interests adverse to the Hazeltine Research Corporation.
In West Texas Refining & Development Co. v. Commissioner, 68 Fed. (2d) 77, the West Texas Co. owned certain assets consisting of a refinery, pipe lines, etc. On June 2, 1925, it and its stockholders entered into a contract with the Standard Oil Co. whereby “they agreed to transfer to the Standard Co. 50 percent of the capital stock ” of a new corporation to be formed, called the Col-Tex Refining Co., for a cash consideration. In actually carrying out the contract the new corporation was formed and issued 50 percent of its stock to the Standard Co. for the cash consideration, which cash consideration and the remaining 50 percent of the stock was transferred to the West Texas Co. in payment for the assets there in question. The question before the court was whether the gain to the transferor was nonrecognizable to the transferor under section 203 of the Revenue Act of 1926. In holding that the transaction was not within section 203, the Circuit Court of Appeals for the Tenth Circuit said in part:
* * * Tlie whole transaction was the means adopted to carry out the contract between the West Texas Company and the Standard Company. In substance it was but one single transaction. * * *
*******
Here it was contemplated that in substance the West Texas Company should dispose of its assets and receive therefor a cash consideration, and also stock. What was done amounted to a single transaction for income tax purposes, and when it was fully consummated the West Texas Company had received only a 50% stock interest in the Col-Tex Company and $184,771.34 in cash. Therefore the transaction was not within the exceptions defined in Sec. 203, supra, and must be considered as a sale.
It is our opinion that the transactions involved in the instant proceedings must be looked at as a whole and, when so viewed, it can not be said that “ immediately after the transfer an interest or control ” of 80 percent or more of petitioner’s capital stock remained in the transferors of the assets. We therefore hold that, under section 204 (a) of the 1924 and 1926 Acts and section 113 (a) of the 1928 Act, the “ basis ” for determining the claimed deductions for exhaustion and obsolescence is the “ cost ” to petitioner of the assets acquired on February 19, 1924.
Issue 1(b) and (c). — What was the cost to p'etitioner of the assets acquired from the Hazeltine Research Corporation and Taylor on February 19, 1924? As full consideration for s'uch assets petitioner issued 155,250 shares of its capital stock to the Hazeltine Research Corporation and 14,750 shares to Taylor, or a total consideration of 170,000 shares. In Seymour Manufacturing Co., 19 B. T. A. 1280, we said: “ The cost of property acquired for stock is the £ fair market value ’ of the stock.” To the same effect see Ambassador Petroleum *18 Co., 28 B. T. A. 868. We believe and have so found in our findings of fact, that the fair market value of petitioner’s stock on February 19, 1924, was $10 per share. On this basis, the cost of all of the assets to petitioner was $1,700,000. This value is considerably more than the respondent has argued for in his briefs, namely, $4.81 per share, and considerably less than the value contended for by petitioner, namely, $20 per share. In arriving at our value of $10 per share we have carefully weighed all the evidence before us and are of the opinion that the record does not justify a higher value or a lower value on February 19,1924, than $10 per share.
Issue 1 (d). — Having decided that the basic date in question is February 19, 1924, and that the cost to petitioner of all the assets acquired on that date was $1,700,000, we come now to the determination of the exact amount of the deduction to which petitioner is entitled for each of the years before us under section 234 (a) (7) of the Revenue Acts of 1924 and 1926, and section 23 (k) of the 1928 Act, which sections, so far as are material here, are identical, and provide as follows:
In computing tlte net income of a corporation * * * there shall be allowed as deductions:
*******
A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.
Under this phase of our determination it is necessary to decide (1) which of the assets acquired by petitioner are subject to the statutory allowance; (2) the portion of the total cost of $1,700,000 that should be allocated to each separate class of assets acquired; (3) the rate of the allowance; and (4) whether the rate first established should be increased in later years due to obsolescence.
Petitioner has briefed these proceedings upon the supposition that all of the assets acquired were subject to the statutory allowance; that it was not necessary to allocate the total cost to any particular asset or group of assets; that the entire cost of all the assets should be spread over either a five or eight-year period (according to the life of the “ patent situation ” as the Board might find from the evidence); and that the entire unexhausted cost remaining on January 1, 1929, should be allowed as a deduction in that year due to obsolescence on account of the commercial appearance at that time of the screen grid invention. On this basis petitioner contends it is entitled to deduct annually, as exhaustion, from 1924 to 1928, inclusive, either one fifth or one eighth of the alleged cost of $3,400,000 (170,000 shares at $20 per share), and for the year 1929, as obsolescence, the remaining unexhausted cost of the patent situation on January 1,1929.
*19 We find ourselves unable to agree with petitioner’s contentions in several particulars. We have already discussed the cost feature and have found such cost to be $1,700,000 instead of the amount contended for by petitioner. This cost represented the cost of all the assets acquired by petitioner, including Patent No. 1,450,080, two patent applications, the inventions described in our findings, three trade-marks, the I. R. M. contract, and the entire business and good will of the Hazeltine Research Corporation. Trade-marks are not susceptible to exhaustion. Norwich Pharmacal Co., 30 B. T. A. 326. Neither is good will. Red Wing Malting Co. v. Willcuts, 15 Fed. (2d) 626; certiorari denied, 273 U. S. 763. It is, therefore, imperative that before any deduction for exhaustion or obsolescence can be determined, the total cost of $1,700,000 must be allocated between the exhaustible and nonexhaustible assets.
Upon the basis of all the evidence before us we are of the opinion and so find that of the total cost to petitioner of all the assets it acquired on February 19, 1924, from the Hazeltine Research Corporation and Taylor, both exhaustible and nonexhaustible, the fair market value of the exhaustible assets was the amount of $1,275,000, and that the fair market value of the nonexhaustible assets on that date was the amount of $425,000.
Issue 1 (e). — Our next question concerns the rate of exhaustion applicable to the cost of the patent, patent applications, inventions, and other exhaustible assets, which we have determined was the amount of $1,275,000. The general rule with regard to the exhaustion of the value or cost of a patent application or invention on a given basic date is that such value or cost is to be written off over a 17-year period dating from the issuance of the patent, unless obsolescence becomes a factor prior to the end of the 17-year period. Hershey Manufacturing Co., 14 B. T. A. 867; affd., 43 Fed. (2d) 298; Tennessee Fibre Co., 15 B. T. A. 133. Where the cost or value relates to an entire group of patents, applications, and inventions, as is the situation here, exhaustion is allowed either over the average life of the patents, as in Prophylactic Brush Co., 25 B. T. A. 676, 686, or upon the life of the principal patent, as in Hyatt Roller Bearing Co. v. United States, 43 Fed. (2d) 1008, 1013; Individuad Towel & Cabinet Service Co., 5 B. T. A. 158, 162; and Hartford-Fairmont Co., 12 B. T. A. 98. In the instant proceedings, we think, in determining the deduction for exhaustion alone, that the cost of $1,275,000 should be spread over a 17-year period, beginning with the date of issuance of the principal patent, which we have found was Patent No. 1,489,228, which was granted on April 1,1924.
Issue 1(f). — We come now to the obsolescence feature. Petitioner has treated the patent, patent applications, and inventions acquired *20 at the time of its organization as a single group. This group contained two general classes of patents, namely, those involving neutralization and those involving unicontrol. In 1929 it became evident that the methods of neutralization would be gradually displaced by the more efficient screen grid tubes, but this displacement had no effect upon the unicontrol patents, which are still in use. Since petitioner has treated both classes of inventions as a single group, we have no basis upon which an allowance for obsolescence can be determined, and we, therefore, hold that petitioner is limited to the deduction for exhaustion in the annual amount of $75,000.
Issue 2. — In the last three docket numbers, covering the years 1927 to 1929, inclusive, petitioner assigns as error the “ Disallowance of expenditures for other and new patent applications and interferences as necessary and proper deductions, cost of litigation, etc.” The respondent in determining the deficiencies for those years disallowed, under the caption of “ patent applications ” and “ patent interferences ”, certain amounts which petitioner had deducted from its gross income as ordinary and necessary expenses. The respondent determined that such items were capital rather than expense items. The evidence on this point is very meager, and insufficient, we think, to overcome the prima facie correctness of the respondent’s determination. The petitioner’s contention on this issue is, therefore, denied.
Issue 3. — Relative to the claimed net loss for the year 1927, the statement attached to the deficiency notice for the two periods in 1927 shows that the respondent determined that petitioner had a net income of $39,711.43 for the period January 1 to April 10, inclusive, and a net income of $105,235.28 for the period April 11 to December 31, inclusive. After making proper adjustments for the proportionate part of the annual allowance for exhaustion, in the amount of $75,000, determined above, it is apparent that no net loss will result. The respondent’s determination on this point is sustained.
Issue I- — The respondent has apparently abandoned his affirmative allegation of error, as he offered no evidence in support thereof and has made no reference to it in his briefs. Respondent, therefore, is not sustained on this issue.
Reviewed by the Board.

Decision will be entered under Bule 50.